UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DERYL CRAIG MORSE,<br><br>Defendant. | Case No. 3:21-cr-00239-JD-1<br><br>**ORDER RE MOTION TO SUPPRESS** |

Defendant Deryl Morse moves to suppress statements he made during a custodial interrogation, and physical evidence obtained by law-enforcement agents during the execution of a search warrant at his residence. Dkt. No. 35. Morse did not request an evidentiary hearing, and there are no disputed facts that might warrant one. *See United States v. Miller*, No. 15-cr-00197-JD-1, 2016 WL 80565, at *1 (N.D. Cal. Jan. 7, 2016). The motion is granted and denied in part.

## BACKGROUND

The salient facts are undisputed. In February 2021, Officer Dustin Nantz of the Eureka Police Department received information from a confidential informant that Morse was selling methamphetamine out of his trailer in McKinleyville, California. Dkt. No. 39 at 25 (statement of probable cause). In March 2021, Officer Nantz asked a different confidential informant to purchase methamphetamine from Morse, and a test performed on the purchased drugs was presumptively positive for methamphetamine. *Id.* Officer Nantz obtained a warrant from the Superior Court of California, County of Humboldt, to search Morse's person and residence. *Id.* at 21 (search warrant). The warrant authorized a search for controlled substances, evidence of controlled substances, and "containers in which any of the items sought could be found." *Id.* at 24.

At approximately 1:00 p.m. on March 10, 2021, Humboldt County Drug Task Force (HDTF) agents established surveillance of Morse's trailer. Dkt. No. 36 at 6 (Officer Nantz's report). At approximately 2:00 p.m., Morse drove away from the premises and officers stopped his vehicle. *Id.* He was ordered out of the vehicle and placed in handcuffs. *Id.* Officer Nantz advised Morse that he had a search warrant for him and his residence, and was assisted by another officer in conducting a search of Morse's person. *Id.* During the search, Morse said he felt dizzy and needed to sit down. *Id.* An officer told Morse to sit on the front bumper of a patrol vehicle while the search continued, and Morse complied. *Id.*

Officer Nantz did not give the *Miranda* warnings to Morse but questioned him anyway. *Id.* He asked if there was anyone at Morse's residence; Morse said his wife, Karri, was there. *Id.* He asked Morse if there were any firearms, methamphetamine, cocaine, heroin, or fentanyl in the trailer. *Id.* Morse denied any firearms but said there was "approximately a pound left" of drugs, without specifying which kind. *Id.* He also said that his wife would show the officers where the drugs were. *Id.* After Morse "kept stating that he was not feeling good," Sergeant Matthew Tomlin called an ambulance for him. *Id.*; *see also* Dkt. No. 40 ¶ 6 (Tomlin Decl.).

Officer Nantz and an HDTF agent went to Morse's trailer to execute the search warrant. Dkt. No. 36 at 6. Karri answered the door in response to their knock, was detained in handcuffs, and was advised by the officers that they had a search warrant for her husband and the trailer. *Id.* Officer Nantz told Karri that Morse said she would show them where the methamphetamine was, but she said she did not know what Officer Nantz was talking about. *Id.* at 6-7. She also denied that there were firearms in the trailer. *Id.* at 7. Moments later, the agent with Officer Nantz found a loaded revolver under Karri's bed. *Id.* The agent contacted Sgt. Tomlin, who had stayed behind with Morse, to ask Morse where the methamphetamine was located. *Id.* The request appears to have been motivated by the fact that "the interior of Mr. Morse's trailer home was like a packrat's house" and "was so full of stuff that investigators would have had to remove everything from the home in order to conduct their search." Dkt. No. 40 ¶ 7. Photographs in the record illustrate the situation. Dkt. No. 35 at 2; Dkt. No. 39 at 6.

Sgt. Tomlin states that, while the search was underway, he had been "engaged in casual conversation [with Morse] about medical issues and matters unrelated to the investigation," and that Morse "was not displaying any signs of apprehension or fear." Dkt. No. 40 ¶ 8. When Sgt. Tomlin got the request to ask Morse about the location of the methamphetamine, he assumed that Officer Nantz had already given the *Miranda* warnings and that Morse had agreed to talk. *Id.* Consequently, he did not give the warnings and "asked Mr. Morse where the methamphetamine was, and Mr. Morse told [him] that all of the drugs were kept in a purple plastic dresser, in the second drawer, next to where Mr. Morse sat in the trailer home's living room." *Id.* The officers opened the drawer and found two bags containing what was suspected to be methamphetamine. Dkt. No. 36 at 7. The officers also found a measuring cup, a digital scale with a crystalline substance on it, and a box of ammunition in the drawer. *Id.* The substances in the two bags tested presumptively positive for methamphetamine. *Id.* at 8.

After finding these items, Officer Nantz gave the *Miranda* warnings to Karri, who declined to speak to him. *Id.* at 7. Officer Nantz left the residence and went to the Humboldt County Correctional Facility (HCCF), where Morse had been taken after he was medically cleared at a hospital. *Id.* at 8. Officer Nantz gave Morse the *Miranda* warnings and asked if Morse would be willing to speak with him. *Id.* Morse responded, "I don't know," which ended the conversation. *Id.* Officer Nantz booked Morse into HCCF. *Id.*

## DISCUSSION

### I. STATEMENTS

On this record, Morse asks to suppress his statements to the officers on March 10, 2021, under *Miranda v. Arizona*, 384 U.S. 436 (1966). Dkt. No. 35. The government objected to this challenge on the theory that Morse "appears to seek an advisory ruling on the admissibility of Mr. Morse's statement at trial," and that the request should be denied without prejudice as premature. Dkt. No. 39 at 7 n.2. Why this might be so is not clear. Morse is not asking for an advisory ruling, but rather an order that the statements be suppressed. Dkt. No. 35 at 9. A motion for the suppression of evidence must be made before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P.

12(b)(3)(C). That is what Morse has done here. Consequently, the question is ripe and properly before the Court.

*Miranda* concluded that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. The government does not dispute that Morse was in custody during the questioning, but opposes suppression on the grounds that (i) the warnings were not required under *Miranda*'s public-safety exception for the initial questioning about whether there were drugs or weapons at the residence, and (ii) Sgt. Tomlin's *Miranda* violation was not the product of deliberate conduct. Dkt. No. 39 at 12-15.

Neither point is well taken. The public-safety exception does not apply here. Under the exception, "an officer's questioning of a suspect before giving a *Miranda* warning is acceptable if it 'relates to an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" *United States v. Reilly*, 224 F.3d 986, 992 (9th Cir. 2000) (quoting *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984)) (cleaned up). It might have been permissible for the officers to ask Morse about weapons and drugs on his person before searching him. *See, e.g.*, *United States v. Carrillo*, 16 F.3d 1046, 1049-50 (9th Cir. 1994). But Officer Nantz asked about drugs at Morse's trailer, which posed no immediate danger to the officers. The government's suggestion that the officers were concerned about exposure to fentanyl is certainly reasonable, but the questions actually asked of Morse went well beyond that ostensible worry.

For Sgt. Tomlin, the government says that his failure to give the *Miranda* warnings was a good-faith mistake based on his belief that Officer Nantz had already done so. This argument is not well taken. The government relies on a statement in *Herring v. United States*, 555 U.S. 135, 144 (2009), that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some cases recurring or systemic negligence." *Id.* But "*Herring* dealt with an officer's reliance on a county clerk's assertion that the defendant had an outstanding warrant, which was in turn based on another law enforcement employee's negligence." *United States v. Camou*, 773 F.3d 932, 945 (9th Cir. 2014). Sgt. Tomlin, by contrast, was never specifically told

4

1    that the *Miranda* warnings had been given, and he does not indicate that he overheard the

2    conversation that gave rise to his mistaken belief. It was unreasonable for an officer to assume

3    that the *Miranda* warnings were given under these circumstances, and in any event "[t]he Supreme

4    Court has never applied the good faith exception to excuse an officer who was negligent himself."

5    *Id.*

6    Consequently, Morse's suppression request is granted. All statements he made to the

7    officers will be excluded from trial.

**II.    PHYSICAL EVIDENCE**

A different outcome is warranted for the physical evidence obtained on the basis of Morse's statements. Morse says that the methamphetamine, associated paraphernalia, and ammunition that the officers collected were the illegal fruit of the *Miranda* violation. Dkt. No. 35 at 8. The government's main response is that the officers had a valid search warrant independent of Morse's statements, and would have inevitably discovered the physical evidence through lawful means. *See Nix v. Williams*, 467 U.S. 431, 447 (1984) ("[I]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received.").

There is a more direct answer. A failure to give the *Miranda* warnings to a suspect does not warrant "suppression of the physical fruits of the suspect's unwarned but voluntary statements." *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion); *see also United States v. Mora-Alcaraz*, 986 F.3d 1151, 1157 (9th Cir. 2021). The only question that must be resolved here is whether Morse's statements were in fact voluntary. *See Patane* 542 U.S. at 640 ("[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.") (internal quotation and citation omitted).

For this inquiry, the Court considers whether the "suspect's statements had been obtained by techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Oregon v. Elstad*, 470 U.S.

5

298, 304 (1985) (internal quotations and citations omitted). The "totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation," inform the analysis. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). A defendant's statement is considered voluntary if it "was given without 'coercive government misconduct.'" *United States v. Dominguez-Caicedo*, 40 F.4th 938, 955 (9th Cir. 2022) (citing *Colorado v. Connelly*, 479 U.S. 157, 163 (1986)). The salient question is whether "there was coercive police action which overbore [Morse's] will and rendered his confession involuntary." *United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014).

Morse says his health concerns establish coercion. He highlights that he was feeling unwell during the interrogation, to the point that the officers called an ambulance for him, his age (58 years old), that he was handcuffed, and the shock he says he experienced from the stop. Dkt. No. 35 at 7-8. It is true that Officer Nantz reported that Morse said he felt "dizzy and need[ed] to sit down," Dkt. No. 36 at 6, and that Sgt. Tomlin observed that Morse "did not look to be in the greatest of health," Dkt. No. 40 ¶ 6. Morse takes the totality of these circumstances to contend that he "was essentially put to a choice: help police, or potentially forgo medical assistance." Dkt. No. 41 at 7.

The record demonstrates otherwise. As the officers' comments indicate, they were aware of, and concerned about, Morse's well-being. They seated him and called an ambulance for this reason. Nothing in the record even remotely suggests that the officers threatened to withhold medical assistance from Morse until he answered their questions. The initial questioning -- during which Morse admitted that he had drugs in his trailer -- came after the officers sat Morse down on the patrol vehicle in response to his complaint that he was dizzy. Sgt. Tomlin's later question about the location of the methamphetamine came after the officers had already called an ambulance for Morse. This is not a case where the police conditioned the defendant's ability to obtain medical help on revealing information that would facilitate an ongoing investigation. *See, e.g.*, *United States v. Booker*, 561 F. Supp. 3d 924, 932 (S.D. Cal. 2021) (interrogator engaged in coercive behavior by forcing defendant to use cellphone in plain view, including entering a sought-after passcode, to call for medication). The record also indicates that Morse's medical

situation was not particularly severe or threatening, such that he would succumb to even the slightest pressure. Morse does not dispute Sgt. Tomlin's statement that they were both engaged in casual conversation while the search of the trailer was being conducted, and it is notable that Morse was medically cleared soon after being taken to the hospital.

## CONCLUSION

Morse's motion to suppress is granted with respect to the statements he provided during his custodial interrogation. His motion is denied with respect to the physical evidence that police obtained as a result of his statements.

**IT IS SO ORDERED.**

Dated: October 4, 2022

JAMES DONATO
United States District Judge